334 So.2d 792 (1976)
BEST ELECTRIC SUPPLY COMPANY, INC.
v.
Lloyd RITTINER, d/b/a Rittiner Engineering Co. and Highlands Insurance Co.
No. 7213.
Court of Appeal of Louisiana, Fourth Circuit.
June 30, 1976.
*793 Sanders & Perlis, Sharon A. Perlis, Metairie, for plaintiff-appellee.
Deutsch, Kerrigan & Stiles, Marian Mayer Berkett, New Orleans, for defendants-appellants.
Before SAMUEL, STOULIG and BOUTALL, JJ.
SAMUEL, Judge.
Plaintiff filed this suit against Lloyd Rittiner, d/b/a Rittiner Engineering Company, and Highlands Insurance Company, his surety, to recover $13,473.89 representing electrical supplies furnished by plaintiff to Ainsworth Brothers Electrical Construction Co., Inc. Ainsworth Brothers was Rittiner's subcontractor for the construction of five three-story apartment buildings, comprising 120 apartments and known as Married Students Apartments, for Louisiana State University in New Orleans.[1] Plaintiff filed two liens under the Public Works Statute (R.S. 38:2242), totaling the amount levied. These liens were bonded by the defendants, who filed an answer denying liability.
After an extensive trial on the merits, judgment was rendered in favor of plaintiff and against the defendants, in solido, for $13,058.14. The two defendants have appealed from that judgment.
As we read the record and the briefs, and as we appreciate the oral arguments, basically there are only two questions presented for this court's consideration. First, did plaintiff sustain its burden of proving delivery of electrical supplies to the job site and, if it did, in what amount? Second, is the plaintiff estopped from recovering because of a telephone conversation in which a representative of *794 the plaintiff stated the subcontractor's account was satisfactory when in fact it was delinquent?
On May 11, 1972 Rittiner entered into a public works contract with the Board of Supervisors of Louisiana State University for the construction mentioned above. Rittiner subcontracted the electrical work on the project to Ainsworth Brothers in June, 1972, and in August, 1972, Ted Ainsworth, a one-third owner of the firm, informed plaintiff his company would purchase from it various wire materials, pipe fittings and other electrical supplies for the project. Such purchases were made and by January, 1973, it became apparent the Ainsworth Brothers' account with plaintiff was considerably delinquent. Plaintiff filed its two liens in March and April, 1973.
At the trial more than sixty invoices and two credit memoranda were filed into evidence by plaintiff. Certain invoices and various receipts were not admitted because they had not been furnished defendant on discovery. The total amount of plaintiff's invoices admitted into evidence was $13,170.30, and from this amount the trial court deducted fifteen isolated items resulting in a net figure of $13,058.14 which the court concluded was owed plaintiff by defendants.
The general contractor and its surety are liable for materials furnished the subcontractor which were actually used in the job or consumed during the process of the work.[2] Louisiana's lien statutes are stricti juris, and the plaintiff must prove its claim for liens by a substantial preponderance of the evidence. However, once the supplier proves delivery to the job site, the burden shifts to the defendant to show the materials were not used in the construction or incorporated into the job.[3]
The supplier need only show by sufficient, competent proof that the materials were delivered to the job site, and need not prove delivery beyond a reasonable doubt as in a criminal case.[4]
The record used by plaintiff in honoring orders made by contractors consists of a multiple carbon form containing seven copies. The first sheet is a shipping and charge ticket, the second a customer invoice, and the third a delivery and/or dray receipt, depending on whether the items listed thereon are purchased over the counter or delivered to the job site. It is important to note that each form is marked to coincide to the particular job to which the materials are furnished and symbols are used to indicate whether the items sold were picked up over the counter or delivered to the job site.
One of the owners of Ainsworth Brothers, Ted Ainsworth, testified on behalf of plaintiff. He explained that in ordering from plaintiff either he, one of his two brothers, or the job superintendent called in the orders, which were either picked up by Ainsworth Brothers or delivered by plaintiff, depending upon the need for the material and the size of the order. Ainsworth, who was the overall supervisor of the job, specifically stated his firm's practice was to designate a particular job on which the order was to be used. Ted Ainsworth is a licensed electrician in four parishes and has been an electrician his entire adult life. He testified without reservation that all of the invoices filed by plaintiff were for materials *795 used on the job or consumed in the construction.
He began to explain on an invoice-by-invoice basis how the particular supplies appearing on each invoice or dray receipt were used in or incorporated into the dormitory job. His explanation was based on information available on the invoices including dates, signatures, descriptions and other information which showed the supplies sold his firm were clearly designated for and used in the dormitory job and not in any of the other Ainsworth Brothers jobs. In order to shorten the length of the trial, the judge intervened and began an examination of the invoices on a random basis, stating without objection from the defendants that it would be assumed the testimony regarding the sample invoices used would be the same as all invoices.
The trial judge examined Ainsworth regarding three categories, items on which there were both invoices and dray receipts, items on which there were only invoices (the dray receipts for which had been excluded by the court) and items on which the invoices showed over-the-counter sales. After examining Ainsworth at length on the sample documents, the trial judge concluded the plaintiff had established a prima facie case of proof of delivery of the merchandise to the job site and its use on the job site.
To refute Ainsworth's testimony, defendant relied heavily upon the testimony of Danny Tyrney, who was with the firm which completed the job after Ainsworth defaulted. He testified regarding an excessive purchase of wire from plaintiff, implying some of these purchases were used on another job, certain items on the invoices which he felt were not called for in the plans and specifications, and certain items purchased in excess or which were not used in the construction. The court was impressed with the witness and especially with his candor in admitting that some of the materials found on the job site and not incorporated into the job could have come from other electrical supply firms as well as plaintiff's firm.
In his reasons for judgment, the trial judge pointed out that most of Tyrney's testimony was based on opinion and estimate and suggested his own disbelief in certain portions of that testimony. As is stated above, once the plaintiff made a prima facie case of delivery to the job site, the burden of proof shifted to the defendant to show the materials were not used in the construction or incorporated therein. It is obvious the trial court concluded defendant's evidence, including the testimony of Tyrney, was not sufficient to overcome that burden and he found as a matter of fact the materials and supplies were delivered to the job site and incorporated therein. The record is such that the trial judge was faced with conflicting evidence, and we cannot say he committed error by resolving that conflict in favor of plaintiff.[5]
Rittiner bases his argument that plaintiff is estopped from asserting a lien against him upon a telephone conversation of November 15, 1972 between Mayo Canulette, a Rittiner employee, and plaintiff's president, Richard Baugnon. On that day Canulette telephoned Baugnon to inquire of the status of Ainsworth Brothers' account with plaintiff on the dormitory job. Baugnon at first refused to give any information about the account, but eventually indicated the account was "satisfactory". No dollar amount was mentioned with regard *796 to any delinquencies. This telephone conversation was one of a series allegedly made by the Rittiner firm to various laborers and suppliers of material to Ainsworth Brothers to determine its liability to them.
The record does not support defendants' plea of estoppel. Canulette admitted the Rittiner firm had been worried about Ainsworth Brothers' financial stability when the job was originally awarded to the Ainsworth firm, and knew from the beginning the latter's financial condition was marginal. It was even admitted the Rittiner firm had checked that financial condition after another contractor had filed a lien against Ainsworth Brothers. At that time Rittiner knew Ainsworth Brothers' financial stability left much to be desired.
To support a plea of estoppel, a party invoking it must prove he has been induced by the action or conduct of another to do something or to follow a course of action which he would not have otherwise taken and which resulted in damage or detriment to him. The trial court found as a fact Rittiner was concerned from the outset of its contract over Ainsworth Brothers' financial stability. It found this concern demonstrated itself before Ainsworth Brothers had purchased from plaintiff most of the materials sold for the job, and this concern continued to manifest itself during the entire project. The court also found as a fact plaintiff's earlier lack of concern about the financial condition of Ainsworth Brothers, as demonstrated by the telephone conversation mentioned above, did not lead Rittiner astray or cause it to do something which it would otherwise not have done.
We agree with those findings. We also conclude Rittiner was not led astray or caused to change its position by the plaintiff.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] Now known as University of New Orleans.
[2] Louisiana Highway Commission v. McCain, 197 La. 359, 1 So.2d 545; John H. Murphy Iron Works v. U.S. Fidelity & Guaranty Co., 169 La. 163, 124 So. 768; Patent Scaffolding Co. v. Ross Corporation, La.App., 172 So.2d 364.
[3] Bernard Lumber Company v. Sayre, 230 La. 17, 87 So.2d 713; Laney Co. v. Airline Apartments, 223 La. 1000, 67 So.2d 570; Jim Walter Corporation v. Emanuel, La.App., 274 So.2d 867.
[4] Haynesville Lumber Co. v. Casey, 165 La. 1065, 116 So. 559; Jahncke Service, Inc. v. Foret, La.App., 139 So.2d 554; R. F. Mestayer Lumber Company v. Tessner, La.App., 101 So.2d 238; Allen B. Cambre Lumber and Supply Co. v. Loomis, La.App., 94 So.2d 908.
[5] An example of the conflict presented to the trial judge was testimony regarding the amount of unused material on the premises at the time Tyrney's firm took over from the Ainsworth firm. Defendants argue vast amounts of material remained on the project but not incorporated therein. This contention was contradicted by Ainsworth, and the testimony of defendants' two witnesses, Mayo Canulette of the Rittiner firm and Dan Tyrney, both can be construed as establishing only minimum and insignificant amount of material was on the premises after the Ainsworth firm left the job. Moreover, the evidence does not indicate the material which was left on the job was sold by plaintiff.